

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARY COLLEEN BROESKI,               )
                                    )
            Plaintiff,              )
                                    )        No.  07 C 5059
vs.                                 )
                                    )        Magistrate Judge Schenkier
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
            Defendant.              )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Mary Colleen Broeski, seeks judicial review of a final decision denying her application for disability insurance benefits, under Section 405(g) and 416(i) of the Social Security Act, 42 U.S.C. §§ 405(g), 416(i)(2006). Ms. Broeski filed an application for Disability Insurance Benefits and Supplemental Security Income payments on February 7, 2005, alleging she became disabled on September 30, 2000 (R. 53). Ms. Broeski's application was denied and, on December 22, 2005, an administrative hearing was held before an Administrative Law Judge (the "ALJ") (R. 15).

Ms. Broeski's claim was denied by the ALJ in a written decision dated January 10, 2007 (R. 12). The ALJ determined Ms. Broeski was not disabled because she found Ms. Broeski had the residual functional capacity to perform light work with limitations during the time period she claimed to be disabled (R. 15, 21, 22). On July 13, 2007, the Appeals Council denied Ms. Broeski's request for review (R. 5), making the ALJ's decision the final decision of the Commissioner. This lawsuit followed.

Ms. Broeski now seeks summary judgment reversing the Commissioner's decision or, in the alternative, remanding the case for further proceedings (doc. # 23). The Commissioner has cross-moved for summary judgment (doc. # 25). For the reasons that follow, the Court grants Ms. Broeski's motion and denies the Commissioner's motion. We reverse the decision of the Commissioner and remand this case for further proceedings consistent with this opinion.[1]

## I.

The following background is taken from the administrative record, the administrative hearing transcript, and the ALJ's written decision. The Court will discuss Ms. Broeski's personal and medical history, followed by a summary of the hearing testimony and the ALJ's written decision.

## A.

Ms. Broeski was 47 years old on the date of the ALJ's decision (R. 12, 20). Ms. Broeski's relevant work experience is in the field of nursing (R. 80). Ms. Broeski graduated from Triton College School of Nursing in 1994, and immediately thereafter worked as a registered nurse in the radiation oncology department at West Suburban Hospital (*Id.*). Ms. Broeski's employment at West Suburban Hospital ended in September 2000 (*Id.*).

Ms. Broeski alleges that she is disabled due to "severe, chronic pain caused by a combination of cervical spondylosis with myelopathy and nerve impingement, lumbar radiculopathy, and cervical degenerative disc disease" (Pl.'s Mem. at 2, *citing* R. 178, 204, 261). Plaintiff's alleged disability appears to stem from an act of domestic violence in 1999, during which Ms. Broeski suffered a fracture of her left clavicle (R. 133). The fracture did not heal, and the fracture fragment was

---

[1]Pursuant to the consent of all parties and 28 U.S.C. § 636, on February 26, 2008, the case was assigned to this Court for all proceedings, including the entry of final judgment (doc. ## 12, 16-17).

removed through surgery on February 3, 2000 (*Id.*). Ms. Broeski continued to have shoulder pain, and on January 8, 2001, Dr. E.J. Bartucci performed an arthroscopy and debridement of her shoulder (R. 133, 135). Before this surgery, Ms. Broeski's medical records indicate that she had pain in her left shoulder but had a full range of motion (R. 133). Doctors removed left shoulder tissue and diagnosed Ms. Broeski as having fibrocartilage with focal calcification, fragments of bone, and skeletal muscle tissue (R. 137).

Dr. Richard Rosseau saw Ms. Broeski on March 28, 2001 (R. 267). Ms. Broeski reported pain in her left shoulder (R. 268), and Dr. Rosseau described Ms. Broeski as having "a complex history involving her left nondominate shoulder (R. 267). Dr. Rosseau found that Ms. Broeski had a good range of motion but pain with abduction greater than 120 degrees and posterior internal rotation (R. 268). Dr. Rosseau performed two subacromial injections and Ms. Broeski noted partial pain relief (*Id.*). Dr. Rosseau saw Ms. Broeski again on May 2, 2001. During this visit Ms. Broeski reported that the injections and steroids had produced significant pain relief in one area of her left shoulder, but she continued to have pain in other areas (R. 269). Dr. Rosseau noted that Ms. Broeski demonstrated "some weakness in external rotation," which he attributed either to pain or a small rotator cuff tear (*Id.*). He continued to prescribe Votarn and Vicoden for pain control (*Id.*).

Ms. Broeski underwent an MRI of her left shoulder on May 29, 2001 (R. 271). Dr. Rosseau found "some persistence subacromial and subdeltoid bursal and shoulder joint effusions," which Dr. Rosseau interpreted to suggest the presence of inflammation and possible bursitis (R. 271). Dr. Rosseau recommended against additional injections because they had not provided any significant benefit, but noted that Ms. Broeski may require further surgery (R. 271).

3

On March 16, 2002, Ms. Broeski met with Dr. John Shea, a professor and surgeon at Loyola University Medical Center (R. 277). In a letter addressed to Ms. Broeski's family physicians, Dr. Shea noted, among other things, that Ms. Broeski had numbness in her hands and fingers, was able to walk about three blocks, was able to drive her car, used a cane or crutch, and had weakness in her arms and legs (*Id.*). Ms. Broeski complained that all positions – sitting, standing, and lying down – bothered her (*Id.*). The doctor reported that toe and heel walking were normal (R. 278). The doctor interpreted the MRI taken of her cervical spine on October 22, 2001, to indicate significant spurs at C4-5 and moderate compression at C4-5 and C5-6 (*Id.*). Dr. Shea noted that the MRI of Ms. Broeski's shoulder taken on May 29, 2001, showed effusions of the subacromial and subdeltoid bursae (*Id.*). Dr. Shea noted that there was significant compression of the spinal cord, signs of positive Hoffman, and hyperactive reflexes; he further noted that any improvement from an interior cervical disectomy and fusion would be limited based on the neurological evaluation he conducted (*Id.*).

On March 19, 2002, Ms. Broeski underwent surgery at Loyola University Medical Center (R. 178-179). Dr. Shea performed an anterior cervical disectomy at C4-5 and C5-6, Allograft bone fusion at C4-5 and C5-6, and placement of a 45 mm Zephyr plate with 15 mm osteosynthetic screws (R. 178). At the follow up visit on April 13, 2002, Ms. Broeski reported that the numbness in her hand and arms was gone, although it had returned during the previous week (R. 276). At the visit Ms. Broeski had bilateral trapezius spasm (*Id.*). Ms. Broeski stated that she was not having any difficulty with sleep (*Id.*).

However, these surgeries did not resolve Ms. Broeski's complaints of pain. In the fall of 2001, Ms. Broeski began treatment with Dr. Neeraj Jain and other doctors of the Pain Specialists of

Greater Chicago (R. 333). Ms. Broeski continued to see Dr. Jain or his colleagues at intervals of two to four months between October 2001 and the time of the evidentiary hearing before the ALJ in 2006 (R. 320, 319, 318, 316, 315, 313, 312, 311, 310, 309, 261, 260). In each of these visits, Ms. Broeski described her pain as no lower than 7 on a scale of 10 (with 10 being the highest level of pain) (R. 319) , and as high as 9 on a scale of 10 (R. 326, 346). We summarize some of those visits below.

Ms. Broeski first saw Dr. Jain on October 15, 2001 (R. 333). Dr. Jain's record of this visit indicates that at the time of the visit Ms. Broeski had good grip strength and could fully abduct her arm, albeit with pain (R. 334). Dr. Jain noted that it was difficult for Ms. Broeski to rotate her arm internally and she had significant pain in the sternocleidomastoid and trapezius muscle (*Id.*).

On November 6, 2001, Dr. Jain gave Ms. Broeski an epidural steriod injection, and Ms. Broeski reported 30 percent relief (R. 194, 196). The patient received additional epidural steroid injections on November 21 and December 6, 2001 (R. 196, 198). Dr. Jain and his colleagues have prescribed Ms. Broeski many different narcotics and other powerful drugs since Ms. Broeski's first visit: OxyContin, Norco, Lyrica, Flexeril, Kadian, etc.[2] (R. 326, 329, 333, 337). Ms. Broeski's last visit, as provided in the court's record, with Dr. Jain or one of his colleagues was on October 23, 2006 (R. 337). The medical regimen at that time included three daily doses of Methadone[3] (R. 336).

Dr. Jain referred Ms. Broeski to Dr. T. Tumlin, a psychologist, who evaluated Ms. Broeski on March 6, 2003 (R. 263). Dr. Tumlin administered the Personality Assessment Inventory and stated the results showed Ms. Broeski did not exaggerate her difficulties or attempt to portray herself

---

[2]All these drugs are used to treat chronic pain. *See* THOMAS HEALTHCARE, PHYSICIANS' DESK REFERENCE (62d ed. 2007)

[3]Methadone is a synthetic opoiod. *See* THOMAS HEALTHCARE, PHYSICIANS' DESK REFERENCE (62d ed. 2007)

in a more favorable light than was true (*Id.*). Ms. Broeski's responses to the Multi-demensional Pain Inventory ("MIP") indicated a pain level that placed her at the 79th percentile of patients receiving treatment for pain (R. 264). The report based on the McGill Pain Questionnaire ("MPQ") placed her at the 96th percentile (*Id.*). Ms. Broeski told the doctor that laying down or using her hands caused the pain to worsen (*Id.*).

On April 14, 2004, Ms. Broeski saw Dr. R. Paul at DuPage Medical Group in regard to neck pain, bilateral upper extremity pain, and numbness and tingling in her legs (R. 262). Ms. Broeski reported her pain to be 7 on a scale of 10 (*Id.*). Dr. Paul conducted a physical examination and found the patient was hyper-reflexic in bilateral and lower extremities and had positive Hoffman's signs bilaterally (*Id.*). Dr. Paul evaluated x-rays and an MRI conducted on the patient. Dr. Paul read the x-rays to indicate significant kyphosis at the C3-4 and C4-5 level with anterolisthesis and a broken screw (*Id.*). The plate that had been implanted in the previous surgery was riding into the C3-4 level (*Id.*). Dr. Paul noted cervical cord compression at the C3-4 level. Dr. Paul stated that Ms. Broeski had experienced a failed fusion, and had significant cervical kyphosis and a cervical myelopathy (*Id.*).

On April 27, 2004, Ms. Broeski was admitted to the emergency room at Hinsdale Hospital (R. 200). The nurse's notes state that Ms. Broeski complained of pain in her neck, pain in her shoulders, and that pain radiated to her arms and caused numbness (R. 203). That same day, Dr. Jain administered an epidural injection near the fusion (R. 204). A similar event occurred on June 1, 2004 (R. 204, 207).

6

Ms. Broeski was seen in an emergency room on June 10, 2005, and the hospital records state Ms. Broeski complained of pain in the neck and lumbar region of her body (R. 213). Dr. Jain administered lumbar epidermal steroid injections (R. 217).

From June 2005 until Ms. Broeski's last visit in the record, October 23, 2006 (R. 350, 351, 348, 346, 341, 339, 337), Ms. Broeski's alleged symptoms were generally consistent. Ms. Broeski complained of pain and of tingling and numbness in her neck, shoulders, and arms (R. 350, 346). During this time Ms. Broeski received epidural steroid injections with selective nerve root block (R. 342, 352). Ms. Broeski reported that the lumbar injections provided her with good low back pain relief, but the injections did not relieve her neck pain which Ms. Broeski claimed radiated into her shoulders and arms (R. 348, 341). At a visit on December 29, 2005, Dr. Yagnesh Dave reported that Ms. Broeski's gate was normal and a bilateral straight leg test was negative (R. 348-349). This was the same on her visit on October 23, 2006 (R. 338). At a visit on October 23, 2006, Ms. Broeski told Dr. Dave that she was having trouble walking and had fallen down while walking (R. 337).

As part of Ms. Broeski's request for social security disability benefits, State Agency examiners assessed her physical and psychiatric conditions. On June 27, 2005, Dr. Dean Velis examined Ms. Broeski (R. 219-222). The examination lasted for 30 minutes (R. 219). Dr. Velis reported that Ms. Broeski complained of "some" range of motion pain, limited range of motion, burning and tingling in her upper extremities, difficulty in writing, and an inability to lift more than 10 pounds (R. 219). Dr. Velis wrote that Ms. Broeski was "cooperative," but appeared to be in "moderate to severe distress" (R. 220). Dr. Velis did not observe any muscle spasms in Ms. Broeski's back, but found that her range of motion of the cervical spine was limited: flexion was twenty degrees, extension was thirty degrees, and Ms. Broeski had cervical compression (R.

7

221). Dr. Velis also noted Ms. Broeski "could not lay supine" (*Id.*). Dr. Velis found Ms. Broeski had full range of motion of all joints (*Id.*). Dr. Velis noted that Ms. Broeski's gait was normal and she was able to bear her own weight without the need of any assisting device to ambulate (R. 222). Ms. Broeski's grip strength was found to be 4/5 in her right hand and 5/5 in her left hand (*Id.*). Ms. Broeski's motor strength was found to be 4/5 in both upper extremities and 5/5 in lower extremities (*Id.*).

Dr. Velis described Ms. Broeski as having a history of cervical syndrome, which was secondary to degenerative disc disease of the cervical spine with a history of fusion (R. 221). He provided no clinical impression of Ms. Broeski's complaints of pain: he did not describe the complaints as inconsistent with the medical evidence, and did not state that Ms. Broeski appeared to be exaggerating her complaints. Nor did he make any finding that Ms. Broeski should be able to lift more than 10 pounds despite her condition.

At the request of the Bureau of Disability Determination Services, a psychiatrist, Dr. V. Chang, examined Ms. Broeski on June 27, 2005 (R. 223-27). The examination lasted for 60 minutes (R. 223). Dr. Chang noted that Ms. Broeski was cooperative, and that she was the source of information and reliable (*Id.*). Ms. Broeski told Dr. Chang that the pain caused her to take a while to get out of bed, and that her children did the cleaning, laundry, and grocery shopping but Ms. Broeski cooked dinner (R. 224). Ms. Broeski also complained of "poor sleep because of her pain" (R. 226). Dr. Chang wrote that Ms. Broeski's stressors were the pain and her three children (*Id.*). Dr. Chang found that Ms. Broeski did not fully meet the criteria for a major depressive disorder, but she did appear to suffer from an adjustment disorder with depressed mood (R. 224-225).

A state agency medical consultant, Dr. Madala Vidya, filled out a Physical Residual Functional Capacity Assessment ("RFCA") dated July 7, 2005 (R. 228-249). The RFCA cited Dr. Velis's medical examination report and determined Ms. Broeski could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand or walk for a total of about six hours in an eight hour workday, sit for about six hours in an eight hour workday, and Ms. Broeski was able to push and pull (R. 229). The consultant determined that Ms. Broeski could never climb ladders or scaffolding but could occasionally climb ramps or stairs, occasionally balance, occasionally stoop, occasionally kneel, occasionally crouch, and occasionally crawl (R. 230). The consultant also determined that any severe impairment Ms. Broeski suffered was caused by pain and not a mental disorder (R. 248).

In May 2006, Dr. Jain suggested that Ms. Broeski see a functional neurosurgeon for consideration of spinal cord stimulation (R. 341). Thereafter, in the fall of 2006, Dr. Jain referred Ms. Broeski to Dr. Joshua Rosenow, Director of Functional Neurosurgery at Northwestern University (R. 361). Ms. Broeski first saw Dr. Rosenow on October 3, 2006; that visit lasted for one hour (R. 364). Dr. Rosenow ordered comprehensive cervical imaging to assess her fusion status, stability, spinal cord, and spinal canal (*Id.*). Dr. R. Hendrix, the attending radiologist, reported the results: there was a reversal of the normal lordotic curve of the cervical spine at C3-4, and the anterior plate was eroding the anterior inferior corner of the C3 vertebral body and prevented normal flexion of the disk space at C3-4 (R. 369). Dr. Rosenow met with Ms. Broeski on November 21, 2006 to discuss the results of the imaging (R. 371). Dr. Rosenow told Ms. Broeski he thought her cervical spine misalignment should be corrected surgically, but that any surgery should be postponed until she quit smoking or if she deteriorated neurologically (*Id.*).

9

On November 15, 2006, the day of Ms. Broeski's disability hearing, Ms. Broeski's attorney faxed Dr. Rosenow a cervical spine residual functional capacity ("RFC") questionnaire (R. 356). Dr. Rosenow completed the questionnaire on November 22, 2006 (R. 360), the day after his visit with Ms. Broeski. Dr. Rosenow diagnosed Ms. Broeski with kyphosis deformity of spine and cervical myelopathy (R. 356). Dr. Rosenow wrote that Ms. Broeski's prognosis was "good" (*Id.*). For some questions, Dr. Rosenow responded "N/A," and the context of those questions indicate Dr. Rosenow intended that abbreviation to mean "not applicable" (R. 357, 358). Dr. Rosenow also responded to some question with "unknown – not assessed" (R. 358, 359, 360). Dr. Rosenow responded "see attached" to some questions (R. 356, 357).

Dr. Rosenow marked that Ms. Broeski was only able to stand/walk less than two hours in any eight hour workday (R. 359). Dr. Rosenow marked that Ms. Broeski could occasionally twist but never bend, crouch, or climb ladders (R. 360). Dr. Rosenow marked that Ms. Broeski's pain or other symptoms were severe enough to constantly interfere with the attention and concentration needed to perform even simple work tasks (R. 358). Dr. Rosenow marked that Ms. Broeski would not need a cane for occasional standing/walking (R. 359). Dr. Rosenow marked that Ms. Broeski had significant limitations with reaching, handling, or fingering, but he had not assessed what percentage of a workday Ms. Broeski would be able to use her arms and hands for activities listed on the questionnaire (R. 360). He further stated that Ms. Broeski's condition would cause her to miss more than four days of work per month (*Id.*).

**B.**

On November 15, 2006, the ALJ conducted a hearing regarding Ms. Broeski's claim for disability benefits. The ALJ asked Ms. Broeski how long she had been using a cane (R. 398).

Ms. Broeski answered about two years but that she didn't use the cane at all times (*Id.*). In response to questioning, Ms. Broeski stated that she had pain in her neck, pain in both sides laterally, pain down her arms into her hands, and numbness and burning in her hands (R. 398-399). Ms. Broeski also stated she sometimes had weakness in her legs and sometimes experienced lower back pain (R. 399). The ALJ asked Ms. Broeski the level of pain she was suffering at that moment on a scale of one to ten (ten being the most severe), and Ms. Broeski responded that her pain level was an eight (*Id.*).

The ALJ asked Ms. Broeski how far she could walk (R. 401). Ms. Broeski responded about half a block (*Id.*). The ALJ asked Ms. Broeski if she always needed the cane (R. 402). Ms. Broeski responded that she needed to hang on to something, like a cart (*Id.*). Ms. Broeski testified that she could only sit a half hour to an hour before she had to move her legs and that she never lays down flat (*Id.*). Ms. Broeski testified that the most comfortable position for her was sitting on her bed with her legs up (*Id.*). Ms. Broeski testified that she had trouble climbing stairs (R. 403). The ALJ asked Ms. Broeski if she had difficulty bending, stooping, crouching, crawling, or kneeling (*Id.*). Ms. Broeski responded affirmatively and stated she could not garden anymore (*Id.*). Ms. Broeski said she had difficulty reaching overhead, but could reach in front of her and bend her arms (*Id.*). Ms. Broeski said her hands get weak and when that happened she tried to shake them or rub them which she testified is sometimes successful (R. 404).

The ALJ asked Ms. Broeski whether she needed to take naps during the day (R. 404). Ms. Broeski said she did take naps during the day because she could only sleep a couple hours at a time because she woke up from the pain (*Id.*). Ms. Broeski stated she slept in a bed sitting upright

11

with about eight pillows behind her (*Id.*). In response to the ALJ's questions, Ms. Broeski stated that she probably naps a total of two hours a day (R. 405).

Ms. Broeski testified she never goes shopping without the help of her children (R. 405). Ms. Broeski said she loaded the dishwasher (*Id.*). Ms. Broeski stated she would fold the laundry in the basement but could not carry the basket of laundry up (R. 405-406). In response to the ALJ's questioning, Ms. Broeski stated that she had the ability to pick up a gallon of milk (R. 402-403). Ms. Broeski testified she drove her son about two blocks to his school every morning (R. 406). Ms. Broeski drove to the hearing (R. 407).

The ALJ asked Ms. Broeski if she had any hobbies (R. 407). Ms. Broeski stated she had been reading a lot (*Id.*). Ms. Broeski indicated that she used to crochet, and had "tried to crochet a little bit" (*Id.*). Ms. Broeski said she had tried to keep her hand going but hadn't been successful at making too much (*Id.*). Ms. Broeski said she used to do needle point; she testified she had tried to do some pillow cases for Mothers' Day but did not complete them (*Id.*).

Ms. Broeski testified that when her youngest son was an infant Ms. Broeski's mother – who Ms. Broeski testified lived three miles away from her home – would help her every day with caring for her youngest child (R. 413-414). Ms. Broeski testified that after her surgery her son Billy stayed at her sister's house in southern Indiana for three months (R. 414). Ms. Broeski testified that her oldest daughter who she lived with had a child, and her oldest daughter helped care for Ms. Broeski's youngest child (R. 415).

Michelle Peters, a vocational expert ("VE"), also testified at the hearing (R. 418). The VE testified that Ms. Broeski obtained skills transferable to light or sedentary work (R. 419). The ALJ asked the VE to consider an individual the same age as Ms. Broeski with the same education and

12

work experience and who could "lift twenty pounds occasionally, ten pounds frequently, stand or walk about six hours during an eight hour day, and sit about six hours during an eight hour day with a sit stand option at will" (*Id.*). The ALJ added that "such an individual can occasionally climb ramps and stairs, occasionally balance, stoop, crouch, kneel or crawl, but should never climb ladders, rope, or scaffolding" (*Id.*). The VE testified that such a person would not be able to work as a nurse, which is Ms. Broeski's past relevant work (*Id.*). The VE testified that the hypothetical person the ALJ proposed could work in certain office clerking positions, assembly type positions, as well as hand packaging situations (R. 420). The ALJ asked how this would be affected if the hypothetical individual needed to use a cane (*Id.*). The VE responded that need for a cane would not affect the ability of the hypothetical individual to work as an office clerk, but would reduce the number of assembly and hand packing positions as an option (*Id.*).

Ms. Broeski's attorney then had an opportunity to ask the VE questions (R. 421). The attorney referred to the hypothetical individual the ALJ proposed and asked how that individual would be affected if the individual was unable to perform occasional fingering and grasping (*Id.*). The VE responded that the individual would not be able to work if they could not use their upper extremities thirty-three percent of a workday. Next, Ms. Broeski's attorney asked what impact it would have if the hypothetical individual had to elevate their legs off the ground at least two feet while at work (R. 422). The VE responded that this would eliminate the job possibilities for the hypothetical individual (*Id.*).

## C.

The ALJ issued her decision on January 10, 2007, which applied the standard five-step sequential evaluation pursuant to 20 C.F.R. §§ 404.1520 and 416.920. At step one, the ALJ found

13

that Ms. Broeski had not engaged in substantial gainful activity since the alleged outset date of her disability (R. 17). At step two, the ALJ found that Ms. Broeski suffered the following severe impairments: cervical spondylosis with myelopathy and lumbar radiculopathy (R. 17-18). The ALJ found that the depression and attention deficit disorder Ms. Broeski was diagnosed with imposed only a mild limitation on Ms. Broeski (R. 18). At step three, the ALJ found that Ms. Broeski's impairments did not meet or medically equal any of the impairments listed in the regulations as so severe as to preclude substantial gainful activity (*Id.*).

At step four, the ALJ determined that Ms. Broeski had the following residual functional capacity: the ability to lift/carry twenty pounds occasionally and ten pounds frequently; the ability to sit and stand/walk six hours in an eight hour workday; the plaintiff was limited to no more than occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; Ms. Broeski could not climb ladders, ropes, or scaffolds; and, Ms. Broeski required a sit/stand option at will and cane as needed for ambulation (R.18). The ALJ found this RFC did not allow Ms. Broeski to perform the requirements of her past relevant work as a registered nurse (R. 20).

At step five, the ALJ found that Ms. Broeski had the residual functional capacity to do other work (R. 21). The ALJ adopted the VE's testimony that a person with the limitations the ALJ posited would be able to work as an office clerk (8,000 jobs), hand packager (2,000 jobs), or assembler (2,000 jobs). Therefore, the ALJ found that Ms. Broeski was not disabled under sections 216(i) and 223(d) of the Social Security Act (R. 22).

In reading these conclusions, the ALJ found that Ms. Broeski's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but the ALJ did not find Ms. Broeski's statements concerning the intensity, persistence, and limiting effects of the

14

symptoms to be "entirely credible" (R. 19). In addition, the ALJ gave little weight to a 2001 medical report because it was done by a family physician for "purposes of obtaining disability benefits from Unum Provident [Ms. Broeski's insurance]" (R. 20). The ALJ gave no weight to a 2001 medical report because it was done by a physical therapist who the ALJ determined was not an acceptable treating source (R. 20). The ALJ gave Dr. Velasco's consultative report "some weight, as it is objective" (*Id.*). The ALJ used the report to highlight Dr. Velasco's statements that "the medications have been effective in controlling symptoms of depression and she [plaintiff] is able to focus and concentrate" (R. 20, 212). However, the ALJ did not cite Dr. Velasco's other statements on the same page in the report, which described Ms. Broeski's condition as involving pain and swelling in her legs and sometimes requiring the use of a cane (R. 212).

Finally, the ALJ stated that she gave no weight to the cervical spine residual functional capacity questionnaire completed by Dr. Rosenow. The ALJ gave three reasons for disregarding Dr. Rosenow's findings: (1) Dr. Rosenow was not a treating source because he examined the claimant only two times, (2) the questionnaire was completed after the hearing to assist the claimant in getting disability benefits, and (3) the questionnaire was incomplete (R. 20).

## II.

To establish a "disability" under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A)(2004). A claimant must demonstrate that her impairments prevent her from performing not only her past work, but also

15

any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A)(2004).

The social security regulations prescribed a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. Under this test, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520; *see also Young v. Sec'y of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992). A finding of disability requires an affirmative answer at either Step 3 or 5. A negative answer at any step other than Step 3 precludes a finding of disability. *Id.* The claimant bears the burden of proof at Step 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.*

In reviewing the Commissioner's (here the ALJ's) decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The Court must accept the findings of fact which are supported by "substantial evidence" (42 U.S.C. §§ 405(g)), defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333 (quotations omitted). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir. 1990); *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence

and give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Sec'y of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir. 1986) (per curiam).

That said, the Commissioner (or ALJ) is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence, and may not select and discuss only that evidence which favors his or her ultimate conclusion. *See Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id.*; *see also Young*, 957 F.2d at 393 (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *See, e.g., Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir. 2001) (quoting *Clifford b. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). This is especially true regarding credibility determinations, since both the case law and the regulations require an ALJ to minimally articulate the specific reasons for the credibility finding. *Zurawksi*, 245 F.3d at 887. Specific reasons are required so that the reviewing court can ultimately assess whether the ALJ's determination was supported by substantial evidence or, if not, was "patently wrong." *Id.* (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

17

Ms. Broeski challenges the ALJ's findings on three grounds. *First*, Ms. Broeski asserts the ALJ erred by giving no weight to the RFC questionnaire filled out by Dr. Rosenow. *Second*, Ms. Broeski claims the ALJ erred in determining that she was not "entirely credible." *Third*, Ms. Broeski argues the hypothetical the ALJ posed to the VE was incomplete and therefore the ALJ erred in relying on the VE's response. We focus on the ALJ's treatment of Dr. Rosenow's RFC report, which we find dispositive of this appeal.

## A.

The ALJ stated she gave no weight to the cervical spine residual functional capacity questionnaire completed by Dr. Rosenow for three reasons: one, Dr. Rosenow was not a treating source because he examined the claimant only two times; two, the questionnaire was completed after the hearing to assist the claimant in getting disability benefits; and, three, the questionnaire was incomplete (R. 20). None of these reasons, separately or together, provides a basis for the complete disregard of Dr. Rosenow.

## 1.

We begin with the question of whether the ALJ could disregard Dr. Rosenow on the ground he was not a treater. The regulations define "treating source" at 20 C.F.R. 404.1502:

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medial evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (*e.g.*, twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your

18

relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

The ALJ concluded that Dr. Rosenow was not a treater because he saw Ms. Broeski only twice (R. 20). In so doing, the ALJ took an unduly cramped view of Section 404.1502. The regulation does not create a bright line test that makes the determination of whether a doctor is a treater based solely on how many visits the doctor has had with the patient. Indeed, Section 404.1502 says a treater may see a patient "only a few times," if that number of visits is typical treatment or evaluation for the condition. The dictionary definition of "few" is "being more than one but indefinitely small in number." HOUGHTON-MIFFLIN, AMERICAN HERITAGE DICTIONARY (4th ed. 2000). Because she improperly focused solely on the number visits, the ALJ failed to consider whether Ms. Broeski's two visits with Dr. Rosenow was a typical number of visits for Dr. Rosenow to evaluate Ms. Broeski's condition.[4]

Moreover, even if Dr. Rosenow was not a treating physician, the ALJ was not entitled to wholly disregard Dr. Rosenow's medical opinions. The regulations state that every medical opinion received will be evaluated. *See* C.F.R. 404.1527(d). The regulations also articulate what factors are to be taken in consideration when deciding how much weight to give to a medical opinion. *Id.* If Dr. Rosenow was a non-treating physician, there seems little doubt he is an acceptable medical source;

---

[4]The Commissioner cites *White v. Barnhart*, 415 F.3d 654 (7th Cir. 2005), to argue the ALJ was correct in her determination that Dr. Rosenow was not a treating source because the plaintiff only saw Dr. Rosenow on two occasions (Def.'s Mem. at 9). In *White*, the ALJ stated that a testifying doctor's opinion regarding whether the claimant suffered from somatoform, a mental disorder, was not given "significant weight," because the doctor did not specialize in mental disorders, had only met with the patient on one occasion, and there was no objective medical evidence to support the doctor's opinion. *White v. Barnhart*, 2004 U.S. Dist. LEXIS 5383, 19-20 (W.D. Wis. 2004). The facts of this case are distinguishable from *White*: Dr. Rosenow met with the patient more than once; the ALJ found the plaintiff suffers from a disorder that Dr. Rosenow specializes in treating; and there is objective evidence to support Dr. Rosenow's opinions, including the imaging tests he ordered.

19

*see* 20 § 404.1513(a): he is a licensed doctor who specializes in treating the physical condition from which Ms. Broeski suffers. The weight to be given to a non-treater's opinion is determined by looking at the length, nature and extent of the plaintiff's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; whether the doctor is a specialist; and "other factors." 20 C.F.R. § 404.1527(d). The ALJ did not consider these factors in deciding to give Dr. Rosenow's finding no weight.

We therefore will remand the case so that, in the first instance, the ALJ may consider and determine whether Dr. Rosenow is a treating physician. If so, the ALJ also must explain whether that opinion is entitled to controlling weight, using the factors set forth in 20 C.F.R. 404. 1527(d)(2). If the ALJ determines that Dr. Rosenow is not considered a treating source whose opinion is entitled to controlling weight, then the ALJ must consider the factors listed in 20 C.F.R. § 404.1527(d) to determine how much weight to assign to Dr. Rosenow's medical opinion.[5]

### 2.

The ALJ stated that a reason for rejecting Dr. Rosenow's RFC questionnaire was that it was "done after the hearing to assist the claimant in getting disability benefits" (R. 20). In so doing, the ALJ erred.

As a factual matter, the ALJ's statement suggests that the sole reason for Ms. Broeski to see Dr. Rosenow was to advance her disability claim. In so suggesting, the ALJ failed to grapple with evidence to the contrary. Ms. Broeski visited Dr. Rosenow on a referral by Dr. Jain in October 2006,

---

[5]In so doing, the ALJ may wish to consider, among other things, the timing of the reports (Dr. Rosenow's was closer to the time of the hearing than was Dr. Vidya's), and the amount of time Dr. Rosenow spent with Ms. Broeski (two hours over two visits). By contrast, Dr. Vidya spent no time with Ms. Broeski, and found she could lift 20 pounds even though Dr. Velis, an agency examiner, found she could lift only 10 pounds.

after Dr. Jain had treated Ms. Broeski for five years without resolving her complaints of pain. Dr. Rosenow first saw her on October 3, 2006 (*before* Ms. Broeski's hearing before the ALJ on November 15, 2006); required her to undergo a CT scan before he could continue his evaluation; and then saw her again on November 21, 2006, at which point he provided an evaluation and options for future treatment. All of this suggests that Dr. Rosenow saw and evaluated Ms. Broeski due to her medical needs (as determined by her treater, Dr. Jain), and not just to advance her disability claim.

The ALJ also failed to address the record evidence explaining why Dr. Rosenow prepared the RFC report. Ms. Broeski's counsel requested that her long-time treater, Dr. Jain, prepare an RFC report, but Dr. Jain responded that the clinic did not prepare such reports (R. 335, 336). Only then did Ms. Broeski's counsel send Dr. Rosenow an RFC report to complete. There is no evidence that counsel influenced the way in which Dr. Rosenow completed the form, or that Dr. Rosenow did so in a way that conflicted with his detailed medical findings.

What's more, even assuming that Dr. Rosenow's RFC report was solely the result of Ms. Broeski's "need to obtain a report in support of [her] claim," that would not justify totally disregarding Dr. Rosenow's opinions. Doctors diagnose and treat patients' symptoms and illnesses, and their medical notes and reports reflect that focus. It seems unlikely that a doctor would ever offer an RFC opinion or something similar except for the purpose of providing evidence for a disability claim. The Social Security regulations do not suggest doctors' RFC opinions should automatically be discounted or treated less credibly than doctors' other medical opinions. In concluding that she could ignore Dr. Rosenow's opinion because it was solely for purposes of advancing her disability claim, the ALJ committed legal error.

The Commissioner cites two cases to support the ALJ's rejection of the questionnaire on the basis that it was filled out so that it could be considered in the disability decision (Def.'s Mem. at 10). Neither case the Commissioner cites supports the proposition that RFC questionnaires can be rejected solely because they were prepared for a disability hearing. The Commissioner cites *Schmidt v. Astrue*, 496 F.3d 833 (7th Cir. 2007), a case in which the ALJ decided the RFC filled out by the claimant's doctor should not be given controlling or substantial weight because the physician's RFC opinion contradicted the same physician's notes made during previous medical examinations. *Id.* at 843. The other case the Commissioner cites is *Dixon v. Massanari*, 270 F.3d 1171 (7th Cir. 2001), in which the appeals court upheld the ALJ's decision not to give an RFC opinion controlling weight because the ALJ supported an opinion that the author of the RFC was not completely objective with "substantial evidence." *Id.* at 1177. Unlike those cases, there is no finding here that the RFC contradicts Dr. Rosenow's other medical opinions. And, neither case supports the ALJ's decision to disregard the RFC analysis.

### 3.

The ALJ also stated she gave no weight to Dr. Rosenow's RFC opinion because it was incomplete. The Commissioner defends that analysis, on the ground that Dr. Rosenow responded "N/A" or "unknown-not assessed" to some of the questions (Def.'s Mem. at 10).

We disagree. Dr. Rosenow is a functional neurosurgeon, and arguably has the most expertise in knowing how Ms. Broeski's medical issues cause limitations in her functioning. By focusing on what questions Dr. Rosenow either deemed not applicable to Ms. Broeski or did not assess, the ALJ threw out the baby with the bathwater. The proper inquiry should have been on Dr. Rosenow's opinions in the RFC report about Ms. Broeski's limitations, and the extent to which they found

22

support in other evidence of record – including Dr. Rosenow's own evaluations of October 3 and November 21, 2006. By failing to engage in that analysis, the ALJ erred.

**B.**

For the reasons we have explained above, the ALJ improperly disregarded Dr. Rosenow's opinions concerning Ms. Broeski's limitations. The limitations found by Dr. Rosenow appear substantial: an inability to stand/walk even as much as two hours in an eight-hour day; the ability to walk only one-half to one block without rest or severe pain; a requirement for shifting positions and intermittent unscheduled breaks; an inability to turn her head or up or down, and a limited ability to turn her head right; significant reaching, handling or fingering limitations; an inability to stoop, crunch, climb ladders, and limited ability to twist and climb stairs; constant pain that would interfere with attention and concentration even for simple tasks; and absences from work more than four days a month (R. 358-60).

These restrictions are far more severe than those in the Vidya RFC report, and more severe than those set forth in the hypothetical that was the basis for the VE's opinion that the ALJ adopted. Thus, while we do not remand for errors that are inconsequential, *see Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003), here the ALJ's error in disregarding Dr. Rosenow's opinion had the capacity to affect the ultimate disability determination.

Accordingly, this error warrants a remand. On remand, the ALJ must decide, using the proper standards, whether Dr. Rosenow was a treating source; if so, whether his opinions should be given controlling weight; and if he was not a treating source, what weight his opinion should be given in light of all the evidence. Whatever her conclusions, the ALJ must adequately explain them so we

23

have the path of her reasoning and can assess whether the conclusions are supported by substantiated evidence. *See Zurawski*, 245 F.3d at 887.[6]

## CONCLUSION

For the foregoing reasons, the Court grants Ms. Broeski's motion for summary judgment (doc. # 23), and denies the Commissioner's motion for summary judgment (doc. # 25). We reverse the decision of the Commissioner and remand the case for further proceedings consistent with this opinion.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: November 6, 2008

---

[6]As a result of this ruling, we do not need to address the plaintiff's challenges to the ALJ's credibility determinations or her reliance on the VE's opinion. However, in making her credibility determinations on remand, the ALJ should explain the path of her reasoning. The ALJ must avoid selectively picking and choosing statements out of a very long record, without explaining why those statements adequately undercut Ms. Broeski's credibility. For example, the ALJ implied that statements made in the record cast doubt on Ms. Broeski's claim she had trouble sleeping, but the ALJ did not adequately explain why she disregarded plaintiff's many similar complaints of sleep trouble found in the record (R. 260, 265, 277, 319, 326, 350). If, as in this case, a plaintiff consistently claimed of severe pain for five years and an ALJ finds those claims not to be credible, the ALJ should specifically address why the ALJ does not find that long history of claims credible. Furthermore, when considering the plaintiff's daily activities and whether they indicate the plaintiff has the ability to work, the ALJ must follow the Seventh Circuit's admonition that there is a "difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days a week." *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2001).